UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
CRUM & FORSTER SPECIALTY CO.,

        Plaintiff,

-against-

SAFETY FIRE SPRINKLER CORP.,

        Defendant.

----------------------------------------------------------x
SAFETY FIRE SPRINKLER CORP.,

        Third-Party Plaintiff,

-against-

91-14 MERRICK BOULEVARD, L.L.C., and
MAVERICK MANAGEMENT, L.L.C.,

        Third-Party Defendants.

----------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. CV-03-6308 (FB)(VVP)

*Appearances:*
*For the Plaintiff:*
STEVEN L. SMITH, Esq.
404 Harvard Avenue
Swarthmore, PA 19081

*For the Defendant:*
ANNA J. ERVOLINA, Esq.
2 Rector Street, 22nd Floor
New York, NY 10006

**BLOCK, District Judge:**

        Plaintiff Crum & Forster Specialty Co. ("Crum") brings this diversity action against defendant Safety Fire Sprinkler Corp. ("Safety Fire"), seeking to recoup $100,000

1

paid by Crum to its insured, Rainbow, USA, Inc. ("Rainbow"), for damage caused by the bursting of a frozen sprinkler pipe (the "freeze-up") at a commercial property leased by Rainbow. Crum's amended complaint asserts a claim grounded in negligence; Safety Fire moves for summary judgment dismissing the complaint on the grounds that (1) it did not owe a duty of care to Rainbow, and therefore cannot be held liable for any damages caused by the freeze-up, and (2) Safety Fire's acts or omissions were not, as a matter of law, the proximate cause of the freeze-up. For the reasons set forth below, the Court concludes that Safety Fire did not owe a legal duty to Rainbow, and accordingly grants Safety Fire's motion for summary judgment.[1]

I.

The following background is taken from the parties' Statements of Undisputed Material Facts, see Local Rule 56.1(a), sworn deposition testimony, and other supporting documents.

A. Rainbow's Leasehold

From February 2002 to February 2003, Rainbow was a tenant in a six-story building located at 91-14 Merrick Boulevard in Queens, New York (the "building"). At all times relevant to the present suit, the building was owned by third-party defendant Merrick Boulevard, L.L.C. ("Merrick"), and managed by third-party defendant Maverick

---

[1] Crum also asserted a breach of contract claim, which it withdrew at oral argument on December 14, 2005. Because the Court concludes that Safety Fire did not owe a legal duty to Rainbow and is therefore entitled to summary judgment on its negligence claim, the Court does not address Safety Fire's alternative argument that its actions did not proximately cause the freeze-up.

2

Management, L.L.C. ("Maverick"). After Rainbow took possession of its leasehold in February 2002, it renovated the property, including reconfiguration of a small area at the front of the premises referred to by the parties as the "mezzanine." This area contained portions of the building's water and electrical systems, as well as housings for the building's security gates.

The lease between Rainbow and Merrick provided that Rainbow was responsible for providing heat and maintaining the heating system in its premises, but that Merrick was required to heat the common areas of the building and maintain and make repairs to those portions of the sprinkler system that were not located under, above, or behind the floor, ceiling, or walls of Rainbow's premises. Maverick employs a full-time Fire Safety Director for the building who is responsible for maintaining the sprinkler system and recording the sprinkler system testings required by New York City; this individual also performs superintendent duties. Merrick's tenants direct problems or complaints regarding the premises either to Maverick or the Fire Safety Director.

**B. Services Provided by Safety Fire**

During the 1990s, Maverick began using Safety Fire to provide sprinkler system services in connection with six or seven of the approximately 75 buildings Maverick manages, including the building located at 91-14 Merrick Boulevard. Safety Fire does not offer contracts for regular sprinkler system service or maintenance, but provides discrete repair services on an as-needed basis, and also offers sprinkler system inspection contracts, pursuant to which Safety Fire conducts monthly visual inspections of a property's sprinkler

system. According to the deposition of Avi Shteirman, president and owner of Safety Fire, Safety Fire's standard inspection contract provides that the customer is responsible for maintaining a minimum temperature of 43 degrees Fahrenheit in all areas of the property where any portion of the sprinkler system is located, and Avi Shteirman informs his customers that Safety Fire is not responsible for evaluating the sufficiency of a property's heat, heating equipment, or insulation. *See* Aff. of Anna Ervolina, Ex. H at 22-23 (Dep. of Avi Shteirman).

While Safety Fire and Maverick entered into inspection contracts for certain properties managed by Maverick and serviced by Safety Fire, both Crum and Safety Fire agree that "Safety Fire never entered into a contract with . . . Rainbow . . ., Merrick . . . , [or] Maverick . . . to provide routine or systematic maintenance or inspection services in connection with the sprinkler system located at" 91-14 Merrick Boulevard, Def.'s Local Rule 56.1 Statement ¶ 2; Pl.'s Local Rule 56.1 Statement ¶ 2 (admitting); rather, Safety Fire provided repair services in connection with the sprinkler system at that building only on an "as-needed basis[,] in response to verbal requests from . . . Maverick." Def.'s Local Rule 56.1 Statement ¶ 1; Pl.'s Local Rule 56.1 Statement ¶ 1 (admitting). According to Avi Shteirman's deposition testimony, Safety Fire technicians conducting repairs for customers with inspection contracts are generally expected to be more alert to potential unrelated problems than are those technicians performing repairs for customers without inspection contracts. *See* Aff. of Anna Ervolina, Ex. H at 31-33 (Dep. of Avi Shteirman). Avi Shteirman also stated at his deposition that while he expects that a repair technician

4

engaged in repair work at a customer's premises will notify an individual who happens to be present at the site if the technician notices an obvious problem, and that making "reasonable efforts" to notify someone is a "good practice," he does not expect his technicians to "go searching for somebody" to notify of potential problems unrelated to the repair they have been summoned to make. *Id.* at 23-24, 26, 27-28. Nonetheless, although Avi Shteirman stated that he "make[s] it clear" to customers that he does "not evaluate heating systems" and "cannot take the responsibility of watching and maintaining heating systems for [his] customers," he acknowledged that on a few occasions prior to the date of the freeze-up, he had alerted Maverick to the potential for problems caused by a lack of heat both in the building located on Merrick Boulevard and at other buildings which Safety Fire had contracted to inspect. *Id.* at 22-23, 51, 54-58.

Safety Fire performed work in the Rainbow premises both before and after the renovations, which included replacing the sprinkler heads in the mezzanine area around May 2002 and re-routing a sprinkler pipe during the course of the remodeling. While performing work in Rainbow's premises during the renovations, Joseph Shteirman, a Safety Fire repair technician, alerted Rainbow's in-house contractor that the mezzanine area where the sprinkler pipe was located would need to be insulated properly. *See* Aff. of Anna J. Ervolina, Ex. K at 46-47 (Dep. of Joseph Shteirman). Joseph Shteirman stated that while his job may not expressly require him to do so, it is his practice to notify a property's superintendent or manager when he notices inadequate heating in the area where he is performing a sprinkler repair, if that individual is readily available at the time.

*See id.* at 37, 62. Joseph Shteirman did not inspect the space following renovations to ensure that it was sufficiently heated because he did not understand this to be part of his "obligation"; however, he recalled being in the mezzanine on a "few occasions" prior to the freeze-up, and recalls it being warm and adequately heated. *Id.* at 42-43, 47.

Safety Fire invoices show that during the period from August 2001 to February 2003, Safety Fire performed approximately 10 repairs to the building's sprinkler system at Maverick's request. There is no evidence in the record that Rainbow ever summoned Safety Fire to provide repairs or service at its premises; rather, the invoices and deposition testimony attest to the fact that the work performed by Safety Fire was done at Maverick's behest. Apart from the conversation between Joseph Shteirman and the in-house Rainbow contractor which occurred during the course of Rainbow's renovations, there is no evidence in the record of any direct contact between representatives of Rainbow and Safety Fire.

### C. The Freeze-Up

Around February 15, 2003, a spell of unusually cold weather coupled with insufficient heating caused a pipe in the leasehold adjacent to Rainbow's to freeze. Maverick called Safety Fire to repair the pipe, but Avi Shteirman does not recall alerting Maverick to the possibility that the cold weather might create problems in other areas of the building. Approximately two days later, on February 17, 2003, a sprinkler pipe located in the mezzanine area of Rainbow's premises also froze and ruptured, causing water damage to Rainbow's property. Responding to a call from Maverick to repair the ruptured

pipe, Avi Shteirman noted that the mezzanine space was uninsulated, and that gaps in the outside walls had allowed snow to enter the space. Mr. Shteirman also observed that the mezzanine contained a space heater that had been disconnected from its power source. Both parties' experts agree that the freeze-up was caused both by the sprinkler pipe's exposure to the cold air which filtered through the gaps in the mezzanine's outside walls, and the failure to provide heat sufficient to keep the air temperature surrounding the pipe above freezing. According to the report of Crum's expert,

> Safety Fire Sprinkler was an expert in the operation and care of sprinkler systems and Maverick Management depended on them for advice. Safety Fire Sprinkler Corp. was negligent in not following the standard of care required of them, by not informing Maverick Management of the potential for freezing of the sprinkler system.

Aff. of Anna J. Ervolina, Ex. L at 3.

Following the freeze-up, Crum compensated Rainbow for its losses pursuant to Rainbow's insurance policy. Crum then filed suit against Safety Fire, alleging that Safety Fire was negligent in failing to inspect and prevent the freeze-up.[2] As elaborated at oral argument, Crum argues that even though no contract existed between Safety Fire and Maverick, Merrick or Rainbow for inspection or maintenance of the sprinkler system at the building, the evidence and deposition testimony demonstrates that, through "custom and usage as between Safety Fire and Maverick," Safety Fire assumed a duty under New York

---

[2] Crum's original complaint named Merrick as a second defendant to this action; Crum's amended complaint named Safety Fire as the sole defendant. Safety Fire has in turn brought the captioned third party action against Merrick and Maverick.

law to "warn Maverick of adverse heating conditions." Tr. of Dec. 14, 2005 Oral Argument at 16.

## II.

### A. Summary Judgment Standard

On a motion for summary judgment, the Court "resolve[s] all ambiguities and draw[s] all factual inferences in favor of the nonmoving party." *Savino v. City of New York*, 331 F.3d 63, 71 (2d Cir. 2003) (citing *Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A Court may grant a motion for summary judgment when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Andersen*, 477 U.S. at 248. Where, as here, the non-moving party bears the burden of proof at trial, the moving party need only "show[] – that is, point[] out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (citation omitted). Upon such a showing, "the non-moving party must respond with 'specific facts showing that there is a genuine issue for trial,'" *Golden Pac Bancorp v. FDIC*, 375 F.3d 196, 200 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)); conclusory statements, conjecture and other types of unsupported assertions are not sufficient. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Andersen*, 477 U.S. at 247-48. Moreover, the dispute

about a material fact must be "genuine," which means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248.

## B. Existence of Duty to Rainbow

Because this is a diversity action, the Court applies the substantive law of New York, the forum state. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Under New York law, the question whether a duty exists in a particular case is generally a question of law for the court. *See Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 585 (1994) ("[T]he definition of the existence and scope of an alleged tortfeasor's duty is usually a legal, policy-laden declaration reserved for Judges to make prior to submitting anything to fact-finding or jury consideration."). New York courts have narrowly circumscribed the situations in which an agreement or contractual relationship between two parties will be held to give rise to a tort duty to a third party. *See Eaves Brooks Costume Co., Inc. v. Y.B.H. Realty Corp.*, 76 N.Y.2d 220, 225 (1990) ("In the ordinary case, a contractual obligation, standing alone, will impose a duty only in favor of the promisee and intended third-party beneficiaries and mere inaction, without more, establishes only a cause of action for breach of contract."). Thus, even if the Court were to accept Crum's argument that by providing repair services on an as-needed basis to the building located at 91-14 Merrick Boulevard, Safety Fire assumed an affirmative duty to alert its customer, Maverick, to the existence of heating conditions that would adversely affect its sprinkler system, Crum cannot maintain a subrogation action against Safety Fire unless the evidence adduced by Crum is sufficient to create a genuine issue of fact as to whether that assumed duty also extended to Rainbow,

a tenant in the building served by Safety Fire.

> The New York Court of Appeals has recognized three situations
>
> in which a party who enters into a contract to render services may be said to have assumed a duty of care – and thus be potentially liable in tort – to third persons: (1) where the contracting party, in failing to exercise reasonable care in the performance of his duties, 'launche[s] a force or instrument of harm'; (2) where the plaintiff detrimentally relies on the continued performance of the contracting party's duties; and (3) where the contracting party has entirely displaced the other party's duty to maintain the premises safely.

*Espinal v. Melville Snow Contractors, Inc.*, 98 N.Y.2d 136, 140 (2002) (internal citations omitted). The underlying rationale for imposing such liability is bottomed on the notion that the defendant's conduct "somehow placed plaintiff . . . in a more vulnerable position than he would have been in had [defendant] never taken any action at all. . . . In short, defendant [ ] could be held liable under an 'assumed duty' theory only if it was reasonably foreseeable that [plaintiff] would rely on the continued [action] and would tailor [its] own conduct accordingly." *Nallon v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 522 (1980).

Crum does not argue that Safety Fire should be held liable under the third situation identified in *Espinal*, but asserts that there are genuine issues with respect to whether Safety Fire assumed a duty to Rainbow either by setting into force an instrument of harm or inducing Rainbow's detrimental reliance upon its actions. The Court disagrees.

Crum has not produced any evidence that would support the imposition of a duty under those circumstances. In *Espinal* the court explained that liability may lie when a defendant "launch[es] a force or instrument of harm" only if that defendant "undertakes

10

to render services and then negligently creates or exacerbates a dangerous condition." 98 N.Y. 2d at 141-42. In arguing that there is a factual issue regarding whether Safety Fire assumed a duty to Rainbow under this theory, Crum states that by "affirmatively" making modifications to the sprinkler pipe in Rainbow's premises, part of which system ran through the mezzanine, "Safety Fire had an affirmative duty to assure the integrity – throughout the entire seasonal cycle – of the crossmain that fed the heads they were installing." Pl. Sur-Reply at 9. This conclusory legal statement is insufficient to raise a genuine material issue as to whether Safety Fire's actions launched an instrument of harm such that it should be held liable to third parties. There is no evidence in the record, nor does Crum even allege, that any of Safety Fire's repair work was negligent, or that by any of its actions Safety Fire either created or exacerbated a dangerous condition in the premises occupied by Rainbow. Without such evidence, Crum's argument that Safety Fire assumed a duty to Rainbow under the first theory identified in *Espinal* fails as a matter of law.

Nor has Crum produced any evidence that Safety Fire's actions induced Rainbow's detrimental reliance. The New York Court of Appeals has stated that "[t]he nexus for a tort relationship between the defendant's contractual obligation and the injured noncontracting plaintiff's reliance and injury must be direct and demonstrable, not incidental or merely collateral." *Palka*, 83 N.Y.2d at 587 (citations omitted). Crum has failed to point to any evidence to demonstrate that any action by Safety Fire put Rainbow in a more "vulnerable position," *Nallan*, 50 N.Y. 2d at 522, than it otherwise would have

occupied, or that reliance upon Safety Fire's actions caused Rainbow to fail to take precautions it might otherwise have taken to prevent the freeze-up. Even Crum's own expert opines that Maverick, not Rainbow, relied upon Safety Fire to warn it of inadequate heating conditions. In the absence of any evidence to support imposition of a duty under this theory, Crum's conclusory statement that "[s]eeing Safety Fire on the premises, and in particular in the [mezzanine], Rainbow relied on it to perform properly, and thus, did not hire its own sprinkler expert," Pl. Sur-Reply at 9, does not create a genuine issue of fact. *See Goenaga*, 51 F.3d at 18 (holding that conclusory statements, conjecture and other types of unsupported assertions are not sufficient to defeat a motion for summary judgment).

Even assuming that Crum had adduced evidence sufficient to create a material issue of fact regarding whether Safety Fire exacerbated a hazardous condition or induced Rainbow's detrimental reliance upon its continued action, public policy considerations would prevent an extension of Safety Fire's duty to a tenant with which it was not in contractual privity. In *Eaves*, the New York Court of Appeals recognized that "inaction may give rise to tort liability where no duty to act would otherwise exist" if "performance of contractual obligations has induced detrimental reliance on continued performance and inaction would result not merely in withholding a benefit, but positively or actively in working an injury," 76 N.Y.2d at 226 (citation omitted), but held that "no matter how this inquiry is resolved, it remains for the courts to determine the fundamental question whether, as a matter of policy, the alleged negligence should result in liability." *Id.* It recognized, therefore, that "[t]he courts' definition of an orbit of duty based on public

policy may at times result in the exclusion of some who might otherwise have recovered for losses or injuries if traditional tort principles had been applied." *Id.* (citation omitted).

Notably, the court in *Eaves* refused, as a matter of public policy, to extend the duty of a sprinkler company that had contracted with a building owner to inspect the building's sprinkler system to a tenant whose property was damaged when the sprinkler system malfunctioned. The court reasoned that the owners and tenant were in a better position to insure against the type of loss at issue, and that imposing liability upon the sprinkler company would require it to "insure against a risk the amount of which they may not know and cannot control, and as to which contractual limitations of liability may be ineffective," thereby resulting in higher rates to all those who require sprinkler system services. *Id.* at 227. The court also noted that the contract between the owner and sprinkler repair company called for only 12 inspections per year at a cost of $120, and that the limited scope of the company's undertaking further weighed against the conclusion that a tort duty to third parties should arise from its performance. *See id.*

*Eaves* forecloses the imposition of a duty to Rainbow in this case. Like the sprinkler company in *Eaves*, Safety Fire did not have an agreement or contract with the building's tenant to perform maintenance services, and its informal arrangement with Maverick to provide services only as requested by Maverick is more limited than the written agreement between the sprinkler company and property owner in *Eaves*; indeed, unlike *Eaves*, there was not even an inspection agreement. The public policy considerations identified by the Court of Appeals in *Eaves* are equally applicable in the present case.

Although Crum argues that *Eaves'* refusal on policy grounds to extend a sprinkler company's duty of care to tenants has been undercut by subsequent decisions and is no longer controlling, the Court disagrees. Neither of the cases cited by Crum suggest the undermining of the underlying holding of *Eaves* that "whether a contractual duty could give rise to tort liability to a third party" requires "a weighing of the policy considerations applicable generally to the question whether a tort duty should be so extended." *Id.* at 223. To the contrary, they reinforce that holding; in each, the public policy considerations, unlike *Eaves*, clearly called for the imposition of liability.

The first such case relied upon by Crum, *Palka*, represents, as explained in *Espinal*, the situation "where the contracting party has entirely displaced the other party's duty to maintain the premises safely." *Espinal*, 98 N.Y.2d at 140 (citing *Palka*, 83 N.Y.2d at 588). Thus, in *Palka*, in ruling that a hospital maintenance company's duty extended to the hospital's employees, thereby allowing an employee to sue for injuries sustained from a negligently mounted wall fan, the court emphasized that unlike the "limited contractual undertaking" at issue in *Eaves*, the maintenance company's agreement with the hospital was "comprehensive and exclusive," requiring it to "train, manage, supervise and direct all support services employed in the performance of daily maintenance duties" and to "become the sole privatized provider for a safe and clean hospital premises." *Id.* at 588-89. The court also noted that the reasoning behind *Eaves'* refusal to extend liability for property damage to third parties does not necessarily apply in personal injury cases, "where other public policies, factors and analytical considerations are in play." *Id.* at 587. The contrast between *Palka* and the present case is palpable; there is no evidence that Safety Fire entered

into a "comprehensive and exclusive" agreement with Maverick for service or maintenance; nor did the freeze-up cause personal injury. Moreover, there is nothing in the present case remotely approximating the "array of factors" which supported imposition of liability in *Palka*: "reasonably interconnected and anticipated relationships; particularity of assumed responsibility under the contract and evidence adduced at trial; displacement and substitution of a particular safety function designed to protect persons like [the] plaintiff; and a set for reasonable expectations of all the parties." 83 N.Y.2d at 589.

Crum's reliance upon the Second Department's decision in *Alsaydi v. GSL Enters. Inc.*, 238 A.D.2d 533 (2d Dept. 1997) is also unavailing. The court simply applied the "well settled" rule that "an elevator maintenance company owes a duty of care to members of the public." *Id.* at 534 (citations omitted). The public policy considerations behind this rule are too obvious to merit comment.

## CONCLUSION

The Court grants defendant's motion for summary judgment; accordingly, the complaint and, perforce, the third party complaint are dismissed.

**SO ORDERED.**

FREDERIC BLOCK
United States District Judge

Brooklyn, New York
December 16, 2005

15